IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RHONDA GIBSON,                          )
                                        )
            Plaintiff,                  )       Civ. A. No. 05-1082
                                        )
            v.                          )       Judge Joy Flowers Conti
                                        )       Magistrate Judge Lisa Pupo Lenihan
LAFAYETTE MANOR, INC.,                  )
                                        )       Docket No. 19
            Defendant.                  )

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that Defendant's Motion for Summary Judgment (Doc. 19) be granted in part and denied in part.  It is recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's FLMA retaliation claim, but denied in all other respects.

### II.  REPORT

This case involves a claim for disability discrimination under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), and a retaliation claim under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA").  Immediately prior to her termination, Plaintiff, Rhonda Gibson ("Gibson"), was employed by Defendant, Lafayette Manor, Inc. ("Lafayette"), as a medical records clerk.  Gibson instituted this action against Lafayette alleging that Lafayette violated the ADA by failing to provide reasonable accommodations, including an extended leave of absence, and violated the FMLA by interfering with and retaliating against her exercise of family medical leave.   This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331  and  42 U.S.C. § 12188.  Venue lies in this district pursuant to 28

U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f).

Lafayette requests that the Court grant summary judgment in its favor and in support thereof, submits the following arguments: (1) Gibson cannot meet the standard of a "qualified individual" under the ADA because she was not able to work in any capacity at the expiration of her FMLA leave; (2) there was no reasonable accommodation that would have enabled Gibson to return to work; (3) the grant of indefinite leave would have been an unreasonable burden and undue hardship on Lafayette; (4) Gibson's ADA claim is precluded by judicial estoppel; (5) Gibson cannot establish an interference claim under the FMLA; (6) Gibson has failed to prove any retaliatory conduct in support of her claim under FMLA; (7) Gibson's claim for economic damages must fail because she has failed to present any evidence of economic loss; and (8) Gibson's claim for punitive and liquidated damages must also fail because she failed to prove any malicious or bad faith conduct. (Def.'s Br. at 4-5.)  Each of these arguments is addressed below.

## A.    **Statement of Facts**

Gibson has held a number of positions with Lafayette since she was hired in August 1998. Immediately prior to her termination, Gibson occupied the position of medical records clerk, which was considered a sedentary position.  She was the only employee working in that department.

Beginning in 1999 and continuing through 2004, Plaintiff had requested and received leave under FMLA, for her own medical conditions[1] as well as to care for her husband[2] who suffers from

---

[1] Gibson suffers from a history of mental and physical impairments, including but not limited to, major depressive disorder and respiratory ailments.

[2] Prior to their marriage on March 27, 2003, Gibson and her husband lived together for sixteen years and during that time, Gibson held him out to be her husband under Pennsylvania common law.  Lafayette argues that Pennsylvania has abolished common law marriage, but nonetheless contends that it granted FMLA leave to Gibson to take care of her husband, prior to their official marriage.  Gibson disputes this, and alleges that although she was granted FMLA leave to care for her husband, she was subsequently told she could not use FMLA leave for her

a chronic illness.  In 2004, Plaintiff was granted twelve weeks of FMLA leave, which she used

intermittently from January 2004 through August 30, 2004.  Of the twelve weeks of FMLA leave

in 2004, Gibson used nine weeks to cope with her major depressive disorder and three weeks to care

for her chronically ill husband.  Sometime in August of 2004, Gibson underwent emergency surgery

for a hernia, at which time the presence of other medical conditions was detected.[3]  On August 27,

2004, Gibson submitted a written request to Frank Geramita  for additional leave to begin after

expiration of her FMLA leave on August 30, 2004.  The relevant portion of Gibson's written request

states:

> I . . . hereby request a continuance of my leave of absence because I am medically unable to return to my duties . . . before the end of the allotted twelve week LOA. . . .
> . . .
>
> I have used a total of 9 weeks to allow myself to recuperate from certain psychological stresses and physical ailments.  The other 3 weeks was used intermittently for a chronically ill spouse who frequently required critical care.  Because I had to use these extra 3 weeks for the care of my husband, I am now unable to recover sufficiently in the remaining time given to me in the LOA in order to return to work.
>
> It is with this in mind that I am requesting this continuance of my LOA. . . . I sincerely hope that you will consider granting me this extension.  I know that the decision is not sole[l]y your[s] to make and understand if it can not be granted.  I do, however, hope that you will keep me in mind for any position that may arise once my hea[l]th has been recovered.

(Ex. E to Def.'s Mot. for Summ. J.)  Lafayette submits that the above request constitutes a request

husband because they were not officially married.  Gibson admitted that Lafayette did subsequently approve her
requests for FMLA leave to care for her common law husband.  (Gibson's Dep. at 51-52 (Ex. B to Def.'s Mot. for
Summ. J.).)

[3]During the hernia operation, several large cysts were found on her pelvis, and she was also diagnosed with
low oxygen deficiency and sleep apnea.

.for additional leave for an indefinite period of time because she was unable to return to work at that time.  Gibson argues that reasonable jurors could conclude that her August 27, 2004 request was for three additional weeks.[4]

In any event, Lafayette denied Gibson's request for additional FMLA leave on August 31, 2004, and advised her that her position was being terminated at that time.  (Ex. F attached to Def.'s Mot. for Summ. J.)  However, Geramita encouraged her to submit an employment application once she was able to return to work.  (*Id.*)  To date, Gibson has not submitted a return to work slip, or a new employment application to Lafayette.

While Gibson was out on FMLA leave, Lafayette assigned either a "Green Thumb" worker[5] or an employee needing a light duty position,[6] depending on whether the leave was intermittent or continuous,[7] to cover Gibson's job duties.  (Geramita Dep. at 42, 117-18.)  It was the practice of

_____

[4]Gibson also describes a conversation that occurred in the parking lot at the end of August 2004 between Frank Geramita and her during which she claims to have told Geramita that she gave Ms. Bowser the August 27, 2004 letter requesting an extension of her medical leave, and that Geramita responded that she should come back and reapply when she gets better. (Gibson Dep. at 65, 67 (Ex. 4 to Pl.'s Resp. to Def.'s Stmt. of Facts; Ex. B to Def.'s Mot. for Summ. J.).)  Gibson further claims Geramita did not specifically ask her when she believed she would be able to return to work, nor did he request that information.  Mr. Geramita does not specifically recall what Gibson told him regarding her medical condition during this conversation, however, he stated he wished her a speedy recovery and welcomed her reemployment when she was able to return to work.  (Geramita Dep. at 69-74 attached as Ex. C to Def.'s Mot. for Summ. J.)  Gibson further contends that she informed Ms. Bowser of the nature of her serious medical condition and assumed she would have been aware of the recovery period given her medical background.  (Gibson Dep. at 65-67, 82.)  However, Bowser stated she only knew of Gibson's hernia operation through another employee and was not aware she underwent a laparotomy. (Bowser Dep. at 34-35 attached as Ex. 3 to Pl.'s Resp. to Def.'s Stmt. of Facts.)

[5]The local Area Agency on Aging provides retired individuals through its "Green Thumb" program to nonprofit organizations for temporary work free of charge.  (Geramita Dep. at 40-41; Gibson Dep. at 68-69.)  These "Green Thumb" workers do not, however, have any special knowledge or experience in medical records.  (Geramita Dep. at 118-19.)

[6]Lafayette created permanent light duty positions for employees who have been off work due to work related injuries, in order to cut down on the costs of workers' compensation.  (Geramita Dep. at 66, 99.)

[7]Lafayette assigned a "Green Thumb" worker to cover Gibson's job when she was out on intermittent FMLA leave, and assigned a light duty CNA to her position when the leave was continuous.  (Geramita Dep. at 42.)

Lafayette to require all employees taking intermittent leave under FMLA to obtain a doctor's slip every time intermittent leave was taken.  (Bowser Dep. at 12.)  For continuous leave under FMLA, it was Lafayette's policy to require a doctor's certification upon the employee's return stating that the employee is able to return to work in his or her position.  (*Id.*)

The medical evidence shows that on September 2, 2004, Dr. Mehta, a psychiatrist, and Scott Tracy, M.Ed., LPC, provided a written opinion to the effect that Gibson suffered from a medical condition that prevented her from working.  (Ex. G attached to Def.'s Mot. for Summ. J.)  They reported that they were treating Gibson for Major Depressive Disorder and noted she also has severe family stressors.  (*Id.*)  Subsequently, in a letter dated August 28, 2006, Gibson's physician, Dr. Mary Beth Drafty, opined that Gibson was not able to work for six to eight weeks post-operatively due to her recovery from abdominal surgery in August 2004 and a post-operative infection in September 2004.  (Ex. 1 to Pl.'s Resp. to Def.'s Stmt. of Facts.)   Dr. Krafty further opined that Gibson also suffered from ongoing family stressors and depression.  (*Id.*)  Despite Gibson's continuing significant family stressors, battles with depression, sleep apnea, morbid obesity, hypoxia and oxygen dependency, osteoarthritis, and digestive problems since November 2004, Dr. Krafty opined that Gibson could resume a sedentary job.  (*Id.*)  However, Dr. Krafty's letter does not specify an effective date for her return to work.

At approximately the same time as Lafayette terminated Gibson's employment, Gibson filed a claim for social security disability benefits, which was subsequently approved on December 3, 2004.  (Ex. B to Def.'s Reply Br.)  In addition, since her termination from Lafayette, Gibson has worked part-time as a personal care attendant for the Department of Public Welfare in its "Workers with Disability" Program in order to earn money to pay for health insurance in the plan of her

choice. [8](Gibson Dep. at 7.)

Beginning on January 1, 2006, Lafayette negotiated a new collective bargaining agreement ("CBA") with its union employees, which includes a provision for an additional three months of medical leave beyond what is provided under the FMLA. (Ex. D to Def.'s Reply Br.) Since January of 2006, Lafayette has extended medical leave beyond the period provided by FMLA by an additional three months to CBA employees. The medical records clerk position that Gibson occupied at the time of her termination was not, and is not now, a CBA position.

Prior to January 1, 2006, Lafayette's policy was to fire any employee the day after their FMLA leave expired if they were unable to return to work. (Geramita Dep. at 64 (Pl.'s Ex. 2).) However, as of January 1, 2006, that is no longer the policy vis a vis CBA employees–Lafayette now waits until the expiration of the additional three months of unpaid leave before terminating CBA employees who are unable to return to work. (Bowser Dep. at 14 (Pl.'s Ex. 3).) The evidence shows that three employees requested an extension of their medical leave after the expiration of their FMLA leave and Lafayette granted their requests. (Bowser Dep. at 13-14.) These requests were made subsequent to the January 1, 2006 change in the CBA and apparently made by CBA employees. (*Id.*)

Gibson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and, on May 6, 2005, the EEOC issued its Dismissal and Notice of Right to Sue. Gibson filed a timely appeal by instituting the present action on August 4, 2005. Discovery is now complete and Lafayette has moved for summary judgment. The positions of the parties have been fully briefed

---

[8]Gibson turns over the money she earns to DPW which applies her earnings toward the cost of her health insurance.

and the motion is ripe for disposition.

**B.**     **Summary Judgment Standard**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**C.**     **Analysis**

As stated earlier, Lafayette raises eight arguments in support of its motion for summary judgment, four of which relate to Gibson's ADA claim; two of which relate to Gibson's FMLA interference and retaliation claims, and the remaining two arguments related to her claims for economic and punitive/liquidated damages.  Each of these arguments is addressed below.

### 1.      Gibson's ADA Claim

Gibson's ADA claim is predicated on Lafayette's alleged failure to make a reasonable accommodation, *i.e.,* denying Gibson's request for an extension of  unpaid medical leave after the expiration of her FMLA leave.  Lafayette moves for summary judgment on this claim, arguing in support that Gibson has failed to show that she is a "qualified individual" under the ADA because she was not able to work in any capacity at the expiration of her FMLA leave.  In the alternative, Lafayette submits that it did not fail to accommodate Gibson because there were no reasonable accommodations that would have enabled her to return to work.  Also in the alternative, Lafayette argues that a grant of indefinite leave would have been an unreasonable burden and undue hardship on it.  Finally, Lafayette submits that Gibson's receipt of social security disability insurance benefits estops her from asserting an ADA claim.  Viewing the facts in the light most favorable to Gibson, the Court concludes that material issues of fact exist with regard to whether Gibson's request for extended leave is a reasonable accommodation and whether it will cause an undue hardship to Lafayette.  In addition, the Court concludes that Gibson's ADA claim is not subject to judicial estoppel.

The ADA was enacted in 1990 to "prevent otherwise qualified individuals from being discriminated against in employment based on a disability."  *Gaul v. Lucent Techs. Inc.,* 134 F.3d 576, 579 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, app. at 347-48 (1997)).  Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms,

8

conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1995). A "qualified individual with a disability" is defined under the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." 42 U.S.C. § 12111(8).

In addition, it is well established that ADA discrimination encompasses the failure to make reasonable accommodations for a plaintiff's disabilities. 42 U.S.C. § 12112(b)(5)(A); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999). In this regard, the ADA specifically provides that "an employer discriminates against a qualified individual with a disability when the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Taylor,* 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)). In addition to modifying existing facilities to make them readily accessible by individuals with disabilities, the term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . or other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The ADA defines the term "undue hardship" to mean:

> an action requiring significant difficulty or expense, when considered in light of the [following] factors . . .
>
> (i) the nature and cost of the accommodation  . . . ;
> (ii) the overall financial resources of the facility . . . involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
> (iii) the overall financial resources of the [employer]; the overall size of the business of the [employer] with respect to the number of its employees; the number, type, and location of its facilities; and

9

> (iv) the type of operation or operations of the [employer], including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility . . . in question to the [employer].

42 U.S.C. § 12111(10).

To prove a *prima facie* case of disability discrimination under the ADA,[9] a plaintiff must show: "'(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment action as a result of discrimination.'" *Taylor,* 184 F.3d at 306 (quoting *Gaul,* 134 F.3d at 580 (citing *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir. 1996)). The ADA claim in the instant matter turns on the second *prima facie* element, that is, whether Gibson is a "qualified individual."

The courts employ a two-part test in determining whether an ADA plaintiff is a qualified individual with a disability. *Gaul,* 134 F.3d at 580 (citing 29 C.F.R. pt. 1630, app.§ 1630.2(m)). First, the plaintiff must show that she meets "'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Id.* (quoting 29 C.F.R. pt. 1630, app. § 1630.2(m) at 351)); *Taylor,* 184 F.3d at 311 (citing same). Second, the plaintiff must demonstrate that she is "able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'" *Id.*; *Taylor,* 184 F.3d at 311.[10] Moreover,

---

[9]A claim for discrimination based on disability under the ADA is analyzed under the legal framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973), which employs the familiar burden shifting analysis. *See Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156-58 (3d Cir. 1995).

[10]There is no question here that Gibson satisfies the first part of this test. Rather, the focus in this case is on the second element–the ability to perform the essential functions of the medical records clerk position with or without reasonable accommodation. Therefore, the Court must determine whether Gibson has demonstrated a material issue of fact with regard to her ability to perform the essential functions of the medical records clerk position with reasonable accommodation.

this determination is made at the time of the employment decision. *Gaul,* 134 F.3d at 580 (citing 29 C.F.R. pt. 1630, app. § 1630.2(m)) (other citation omitted).

To withstand summary judgment, the plaintiff/employee bears the initial burden of proving that she is otherwise qualified. *Walton v. Mental Health Ass'n of Sw. Pa.,* 168 F.3d 661, 670 (3d Cir. 1999). However, if the employee alleges that an accommodation is needed, she must also prove that an effective accommodation exists that would make her otherwise qualified. *Id.* As to the issue of whether the requested accommodation is reasonable, the plaintiff/employee must only establish the existence of "an 'accommodation' [that] seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *US Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002) (citing *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir. 2001); *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir. 1995); *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C. Cir. 1993)); *see also Gaul,* 134 F.3d at 580 (citing *Shiring v. Runyon,* 90 F.3d 827, 832 (3d Cir. 1996) (plaintiff can satisfy his burden of showing a material issue of fact exists as to his ability to perform the essential functions of his job with reasonable accommodation by making at least a facial showing that his proposed accommodation is possible)). Once the plaintiff has met this burden, the burden shifts to the defendant/employer, who must then establish "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* (citing *Reed, Borkowski,* and *Barth, supra*).

### a.  Qualified Individual

In the case at bar, the Court finds that a material issue of fact exists as to whether Gibson is a "qualified individual" under the ADA. The Court is not persuaded by Lafayette's argument that an essential function of Gibson's job is regular attendance at work and since she could not return

to work in any capacity at the expiration of her FMLA leave, she could not perform the essential functions of her job, with or without reasonable accommodations. Although for most jobs regular attendance at work is an essential function,[11] where the reasonable accommodation requested is leave from work, regular attendance at work is not the relevant inquiry. *Shannon v. City of Philadelphia,* No. CIV.A. 98-5277, 1999 WL 1065210, *5 (E.D.Pa. Nov. 23, 1999)(citing *Rascon v. U.S. West Commc'ns, Inc.,* 143 F.3d 1324, 1333 (10th Cir. 1998)) (other citations omitted). In *Rascon*, the court of appeals stated that "the question of whether attendance is an essential function is equivalent to the question of what kind of leave policy the company has." *Id.* The evidence here shows that at the time Gibson requested an extension of her FMLA leave in August of 2004, Lafayette had a policy of automatically terminating employees who could not return to work at the expiration of FMLA leave.[12] However, that does not end the inquiry here.

According to the EEOC, modification to "no-fault' leave policies[13] of employers, such as the one in effect at Lafayette in August of 2004, is a form of reasonable accommodation. *See EEOC*

---

[11]"Essential functions" are defined under the ADA as the "fundamental job duties" of a particular position. 29 C.F.R. § 1630.2(n)(1). Whether a certain function is essential is determined by consideration of the following factors: (1) "the employer's judgment as to what functions of a job are essential;" (2) "the amount of time spent on the job performing a particular function;" (3) "the consequences of not requiring the job holder to perform the function;" and (4) "the number of other employees available among whom the performance of a particular function may be distributed." *Shannon v. City of Philadelphia,* No. CIV.A. 98-5277, 1999 WL 1065210, *5 (E.D.Pa. Nov. 23, 1999) (citing 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)) (other citations omitted). Whether a particular function is essential to a job is determined based on the particular facts of each case. *Id.* (citing 29 C.F.R. pt. 1630, app. §1630.2(n)).

[12]Although Gibson alleges that Lafayette extended leave for three other employees at the expiration of FMLA leave, the evidence shows that the extended leave occurred *after* implementation of a new CBA in January of 2006 which now provides for an additional 3 months of unpaid medical leave for CBA employees. The evidence further shows that the three employees who requested and were granted such leave were CBA employees. The medical records clerk position that Gibson occupied prior to her termination is not a CBA position, and therefore, is not eligible to the extended leave under the CBA.

[13]A "no-fault" leave policy is one in which employees are automatically terminated after they have been on leave for a certain period of time. *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* 2002 WL 31994335, * 14 (Oct. 17, 2002).

*Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* 2002 WL 31994335, *15, 19 (Oct. 17, 2002) ("*EEOC Enforcement Guidance*").  Indeed, the *EEOC Enforcement Guidance* provides that "[i]f an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its "no-fault" leave policy to provide the employee with the additional leave, unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship." *Id.* Therefore, the fact that Gibson could not return to work in any capacity at the expiration of her FMLA leave is not dispositive of whether she is a "qualified individual."  Accordingly, Lafayette's motion for summary judgment on this ground should be denied.

### b.    Reasonable Accommodation – Interactive Process

Moreover, the Court finds no merit to Lafayette's alternative argument that it did not fail to accommodate Gibson because there were no reasonable accommodations that would have enabled Gibson to return to work.[14] Lafayette's argument is flawed because it assumes that Gibson requested an indefinite leave of absence which it claims is unreasonable, and that no other reasonable accommodations exist.[15]  The Court finds that Lafayette may have put the proverbial cart before the horse, as the evidence shows that Lafayette failed to participate in the interactive process upon learning of Gibson's request for an extension of her medical leave as an accommodation.

---

[14]Lafayette submits that other than extended medical leave, which it contends is unreasonable because it was for an indefinite period of time, no other reasonable accommodations existed that could have enabled Gibson to return to work at the expiration of her FMLA leave, nor did Gibson request any other possible accommodation. Gibson does not appear to dispute Lafayette's statement that no other reasonable accommodations existed that would have enabled her to return to work.

[15]*See* discussion, *infra* in Part 1.c.  regarding Lafayette's argument that Gibson's requested accommodation amounted to indefinite leave and therefore was unreasonable and/or would cause it undue hardship.

The case law in this Circuit holds that the employer's  duty to participate in a good faith interactive process is triggered upon receiving notice of an employee's disability and request for accommodation.  *Taylor,* 184 F.3d 314.  The regulations implementing the ADA clearly establish that the "purpose of the interactive process is to determine the appropriate accommodations:  'This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'"  *Id.* at 316 (quoting 29 C.F.R. § 1630.2(o)(3)).   Although the interactive process contemplates a good faith exchange of information on both sides, the courts have interpreted the regulations to place the burden on employers to take the initiative and request additional information that it believes it needs.  *Id.* at 315.  The Court of Appeals in *Taylor* reasoned that "[t]he interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome.   That's not the proactive process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow."  *Id.* 315-16 (footnote omitted).   Nonetheless, since participation is the obligation of both parties, the employer will have fulfilled its obligation if, after conferring with the employee to find possible accommodations, the employee fails to supply requested and/or necessary information.  *Id.* at 317.  In all events, the interactive process does not alleviate the employee's burden of proving that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions.  *Id.* (citing *Walton,* 168 F.3d at 670).

To establish that an employer failed to participate in the interactive process, a disabled

employee must prove: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith"  *Id.* at 319-20 (citing *Mengine,* 114 F.3d at 420; *Bultemeyer v. Fort Wayne Comm. Sch.,* 100 F.3d 1281, 1285 (7th Cir. 1996); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir. 1996)).  On the other hand, employers can demonstrate that they participated in good faith in the interactive process by showing, for example, that they met with the employee who requested the accommodation, requested information about the condition and what limitations the employee has, asked the employee specifically what she wanted, that they considered the employee's request, and offered and discussed available alternatives when the request is too burdensome.  *Id.* at 317 (citing 29 C.F.R. pt. 1630, app. § 1630.9).

Viewing the facts in the light most favorable to Gibson, the Court finds that material issues of fact exist as to whether Lafayette made a good faith effort to assist Gibson in seeking the accommodation of extended leave and whether Gibson could have been reasonably accommodated but for its lack of good faith.  Once Lafayette received Gibson's August 27, 2004 letter, it had a duty, at a minimum, to request from Gibson additional information regarding the treatment needed, the prognosis for recovery and the length of the extended leave requested, prior to making a decision.  Had it done so, Lafayette would be on more solid ground.  It certainly is not clear from the record whether Gibson could have returned to work at her medical records clerk position within a period of time that would not have been unreasonable.  Although Dr. Mehta and Scott Tracy opined that she could not return to work as of September 2, 2004, Lafayette did not have the benefit

15

of this information at the time it terminated Gibson, nor did Lafayette, upon receipt of this letter, request Gibson to obtain additional information from these practitioners as to the duration of her leave.  Lafayette cannot now argue, with the benefit of hindsight, that its actions were justified.[16] The record is completely devoid of any evidence showing that at the time of Gibson's termination on August 31, 2004, Lafayette participated in the interactive process. Rather, the record shows that it did not possess any information upon which to conclude that Gibson's request for extended leave was indefinite and therefore unreasonable.  Lafayette merely acted on its "no-fault" policy of terminating employees who were unable to return to work at the expiration of their FMLA leave. This alone violates the *EEOC Enforcement Guidance*.

In response, Lafayette argues that it was excused from engaging in the interactive process because  Gibson was unable to work in any capacity at the expiration of her FMLA leave, and therefore, no reasonable accommodations existed that would have enabled her to perform the essential functions of her job.[17]  In support of this argument, Lafayette cites the Court of Appeals decision in *Mengine,* stating that "'if reasonable accommodation is impossible, nothing more than

---

[16]In determining whether a leave request is a reasonable accommodation, the prospect of the employee's recovery from treatment or enablement to return to work should not be judged by hindsight, but rather, by what reasonably appears at the time the leave is requested.  *Garcia-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 655 (1st Cir. 2000) (citing *Evans v. Fed. Express Corp.,* 133 F.3d 137, 140 (1st cir. 1998)).

[17]Lafayette also appears to argue by implication that failing to engage in the interactive process where a reasonable accommodation does not exist, demonstrates, at most, that it was behaving callously which, based on *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir. 1997), does not give rise to liability under the ADA. ("The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made.")  Lafayette appears to have taken this statement in *Willis* out of context.  The Third Circuit's reference to this statement by the Eleventh Circuit in *Mengine* and *Taylor* was to emphasize that once the facts have been developed, a jury may reasonably conclude from the evidence that there is no job that the disabled employee can perform with or without accommodation, despite the employer's bad faith in the interactive process.  In that situation, the employer will not be punished for behaving callously. At this stage of the litigation, however, a material issue of fact exists as to whether Lafayette participated in bad faith in the interactive process, thereby precluding summary judgment on Gibson's ADA claim.

communication of this fact is required..'" *Taylor,* 184 F.3d at 317 (quoting *Mengine,* 114 F.3d at 420-21). However, Lafayette omits the crucial part of the court of appeals' holding which immediately followed: "'Nonetheless, if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated, thereby risking violation of the Rehabilitation Act.'" *Id.* (citing *Mengine, supra*). The Court of Appeals in *Taylor* further opined:

> We explained that whether an employer's duty to participate in the interactive process has been discharged will often be a matter of "timing": i.e., the employer will almost always have to participate in the interactive process to some extent before it will be clear that it is impossible to find an accommodation that would allow the employee to perform the essential functions of a job.
> . . .
>
> When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process. An employer who acted in bad faith would be in essentially the same, if not better, position than one who participated; that is, both employers would be arguing that the employee failed to find an accommodation making him or her able to perform the essential function of the job. The less the employer participated, the easier this would become, and as a result, the requirement that employers participate in the interactive process would be toothless. Thus, where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.

*Taylor,* 184 F.3d at 317-18 (citations omitted). Because Gibson has presented evidence that Lafayette did not act in good faith in the interactive process, a material issue of fact exists thereby precluding summary judgment on the issue of whether a reasonable accommodation existed that would have allowed Gibson to perform her job.

17

With regard to Gibson's burden in opposing summary judgment on her ADA claim, the Court finds that Gibson has met her initial burden of proving that an effective accommodation exists that would enable her to perform the essential functions of her position as medical records clerk, and that such accommodation appears reasonable on its face.  The requested accommodation–extension of her unpaid medical leave–arguably could have allowed her to return to work after seeking necessary medical treatment within a reasonable period of time and therefore is effective.[18]  Second, the requested accommodation here appears reasonable on its face, as a number of courts and other authority have recognized that a leave of absence for medical treatment may constitute a reasonable accommodation under the ADA.  *See, e.g., Wilson v. Lemington Home for the Aged,* 159 F.Supp.2d 186, 201 (W.D.Pa. 2001)(recognizing that medical leave of absence can be a reasonable accommodation) (citing *Basith v. Cook County,* 241 F.3d 919, 932 (7th Cir.2001); *Humphrey v. Mem. Hospitals Ass'n*, 239 F.3d 1128 (9th Cir.2001); *Criado v. IBM Corp*., 145 F.3d 437 (1st Cir.1998) ("stating that leave may constitute reasonable accommodation"); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr*., 155 F.3d 775, 782 (6th Cir.1998) (citing *Criado, supra*); *Rascon v. U.S. West Commc'ns, Inc*., 143 F.3d 1324, 1334 (10th Cir.1998) ("stating that 'time for medical care or treatment may constitute a reasonable accommodation'"); *Dockery v. North Shore Med. Ctr*., 909 F.Supp. 1550, 1560 (S.D.Fla.1995) ("recognizing that unpaid leave may constitute reasonable accommodation"); *Schmidt v. Safeway, Inc*., 864 F.Supp. 991, 996 (D.Or.1994) ("reasonable accommodation may include leave of absence for treatment")).  In addition to the above authority,

---

[18]In order to constitute an effective accommodation, a proposed period of leave "must be instrumental to effect or advance a change in the employee's disabled status with respect to the job, so that the employee is enabled to do it.  A period of leave would meet this criterion if it permitted the employee to receive therapy or treatment that would succeed in removing the obstacle to employment the particular disability posed."  *Garcia-Ayala v. Lederle Parenterals, Inc*., 212 F.3d 638, 655 (1st Cir. 2000) (citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998); 29 C.F.R. pt. 1630, app.; 29 C.F.R. pt. 32, app. A(b)).

the Interpretive Guidance on Title I of the ADA provides that a reasonable accommodation could include "additional unpaid leave for necessary medical treatment."  29 C.F.R. pt. 1630, app. §1630.2(o).  Similarly, the regulations promulgated by the Department of Labor indicate that a reasonable accommodation may require an employer "to grant liberal time off or leave without pay when paid sick leave is exhausted and when the disability is of a nature that it is likely to respond to treatment of hospitalization."  29 C.F.R. pt. 32, app. A(b).  Therefore, because Gibson has met her burden of proving the requested accommodation is facially reasonable, the burden shifts to Lafayette to prove that the requested accommodation is unreasonable and/or would cause it undue hardship under the particular facts of this case.

**c.      Undue Hardship**

In its next argument, Lafayette contends that a grant of indefinite leave would have been an unreasonable burden and undue hardship on it, and therefore, it did not violate the ADA in denying Gibson's request for an extended leave.  The Court finds, however, that Lafayette's argument raises material issues of fact thereby precluding summary judgment on Gibson's ADA claim.

Lafayette's argument erroneously assumes that the leave requested was for an indefinite period of time.  Because Lafayette failed to participate in the interactive process, the term of leave had not been determined at the time it denied the request.  Had Lafayette engaged in the interactive process, it could have requested that Gibson provide it with the necessary information needed to determine the reasonableness and/or undue hardship of the request.  The fact that Gibson never provided this information at the time is irrelevant as there is no evidence that she was ever asked to provide it.  Had the evidence showed that Lafayette requested the information from Gibson and she failed to provide it, then the result here would be different.  However, the record is void of any

19

evidence showing that Lafayette requested any clarification from Gibson regarding the nature of treatment, prognosis and expected duration of her medical conditions.  Indeed, the record shows that Lafayette made the decision to terminate Gibson on August 31, 2004, one day after it claims to have received her request for accommodation, without the benefit of any of the medical evidence in the court record.[19]  In addition, Lafayette's decision to deny Gibson's request for accommodation and terminate her employment, without further input from Gibson or her physicians, contravenes the purpose behind the interactive process.[20]

Moreover, Lafayette provides no real evidence of undue hardship, choosing instead to rely on its legal argument that a leave of absence for an indefinite duration is not a reasonable accommodation as a matter of law.  Having rejected that argument, the Court is left with Lafayette's conclusory statement that granting Gibson's request for an indefinite leave of absence would have been unreasonable and unduly burdensome.  The only evidence offered in support of this statement is Mr. Geramita's testimony to the effect that Gibson worked in a one-person medical records department and in her absences, her duties were shifted to other employees and departments, and to continue this for an indefinite period would impose a substantial burden on Lafayette and would be wholly unreasonable.  (Def.'s Br. at 15.)  Lafayette's argument is flawed in two respects: (1) it again  assumes that the evidence establishes, unequivocally, that the requested leave was for an indefinite period of time; and (2) it fails to provide the required evidentiary support to prove undue hardship.        While the Court acknowledges that leave for an indefinite period of time has been

_____

[19]Lafayette did not possess the September 2, 2004 letter from Dr. Mehta and Scott Tracy, or the August 28, 2006 letter from Dr. Krafty at the time it denied Gibson's request for accommodation.

[20]The interactive process can be thought of as a less formal, less costly, form of mediation, and when taken seriously be the parties, can obviate the need for litigation.  *Taylor*, 184 F.3d at 315-16 & n. 6 (citing *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 149 (3d Cir. 1998)).

found to be an unreasonable accommodation,[21] the undisputed evidence here does not show that the requested leave was for an indefinite period of time.  As explained above, Lafayette did not attempt to obtain information in August/September 2004 that would have established that the requested leave was, in fact, for an indefinite period.  On the other hand, Plaintiff has presented some evidence to suggest that she was able to return to work in 2004.[22] Thus, a material issue of fact exists as to whether the requested leave was for an indefinite period of time and therefore, Lafayette's reliance on this factor in support of its burden to show undue hardship is misplaced.

Nor does the record otherwise contain sufficient evidence to prove undue hardship. According to the EEOC:

> Generalized conclusions will not suffice to support a claim of undue hardship.   Instead, undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense.  A determination of undue hardship should be based on several factors, including:
>
> • the nature and cost of the accommodation needed;
> • the overall financial resources of the facility making the reasonable accommodation; the

---

[21]*See, e.g., Dogmantis v. Capital Blue Cross,* 413 F.Supp.2d 452, 460 (E.D.Pa. 2005) (citing *Fogleman v. Greater Hazleton Health Alliance,* 122 Fed.  Appx. 581, 585 (3d Cir. 2004) ("holding that an indefinite or open-ended leave 'does not constitute a reasonable accommodation'"); *Peter v. Lincoln Tech. Inst.,* 255 F.Supp.2d 417, 437 (E.D.Pa. 2002) (citing to decisions in the Fourth, Fifth, Sixth, and Tenth Circuits holding that indefinite leave is "inherently unreasonable")).  However, *Dogmantis* is distinguishable in that the employer in that case actually participated in the interactive process prior to denying the requested accommodation.  In *Fogleman,* the plaintiff failed to present any evidence that she could eventually return to work after treatment. 122 Fed. Appx. at 586.  In *Peter,* the court found the employer did not have an obligation to engage in the interactive process because the plaintiff never initiated the process by requesting accommodation.  255 F.Supp.2d at 437.

[22]Dr. Krafty's August 28, 2006 letter does not foreclose the possibility that Gibson was capable of returning to work at an earlier date; rather, Dr. Krafty merely indicates that Gibson was capable of returning to work at a sedentary position as of the date of her letter.  Moreover, Dr. Krafty's letter does indicate that the anticipated recovery period for Plaintiff's medical condition in September 2004 was six to eight weeks.  This evidence is sufficient to raise a material issue of fact as to the duration of the leave that would have accommodated Gibson's disability.

> number of persons employed at this facility;
> the effect on expenses and resources of the
> facility;
>
> • the overall financial resources, size, number
> of employees, and type and location of
> facilities of the employer (if the facility
> involved in the reasonable accommodation is
> part of a larger entity);
>
> • the type of operation of the employer,
> including the structure and functions of the
> workforce, the geographic separateness, and
> the administrative or fiscal relationship of the
> facility involved in making the
> accommodation to the employer;
>
> • the impact of the accommodation on the
> operation of the facility.

*EEOC Enforcement Guidance* at * 28 (citing 42 U.S.C. § 12111(10)(B) (1994); 29 C.F.R. §

1630.2(p)(2) (1997); 29 C.F.R. pt. 1630 app. § 1630.2(p) (1997)) (footnote and other citations

omitted).  Other than the testimony of Mr. Geramita noted above, the record does not contain any

evidence showing exactly how the proposed accommodation would cause it undue hardship.  The

Green Thumb workers were not paid by Lafayette.  Also, Lafayette has in the past created light duty

positions for employees to reduce the costs of workers compensation. A CNA who needed light duty

filled in for Gibson during her continuous FMLA leave, who otherwise would have still been

collecting workers' compensation, which also appears to have benefitted Lafayette.  Moreover, the

fact that Lafayette now allows CBA employees to take an additional three months of unpaid medical

leave suggests that allowing additional leave may not be as much as a hardship as Lafayette

contends.  In light of the record and applicable legal authority, the Court concludes that Lafayette

has not met its burden to prove undue hardship.

### d.    Judicial Estoppel

Perhaps recognizing the futility of its prior arguments,  Lafayette raises for the first time in

its reply brief a judicial estoppel argument to Gibson's ADA claim.  In particular, Lafayette attempts to foreclose Gibson's ADA claim by arguing that under *Detz v. Greiner Industries, Inc.,* 346 F.3d 109 (3d Cir. 2003), she is estopped from claiming in this litigation that she is a qualified individual with a disability because she was collecting social security disability insurance ("SSDI") benefits at the same time. (Def.'s Reply Br. at 2.)  Lafayette asserts that because Gibson applied for SSDI benefits on August 24, 2004, and she was awarded and continued to receive SSDI benefits until at least January 2006 (the date of Gibson's deposition), this Court should *a fortiori* conclude that she is automatically estopped from claiming  she could have returned to work in November of 2004 with reasonable accommodation.   However, neither *Detz* nor controlling Supreme Court authority, supports this conclusion.  *Detz,* 346 F.3d at 116 (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797-98 (1999)).

In response, Gibson correctly points out that the Supreme Court addressed the exact issue of the relationship between SSDI benefits and claims under the ADA in *Cleveland v. Policy Mgmt. Sys. Corp.*, and determined that "pursuit, and receipt of, SSDI benefits does not automatically estop the recipient from pursing an ADA claim.  Nor does the law erect a strong presumption against the recipient's success under the ADA."  526 U.S. at 797-98.  Gibson argues that Lafayette has failed to identify any statements, sworn or otherwise, in her SSDI application, that are genuinely inconsistent, but rather, rests merely on the fact that she collected SSDI benefits, which it cannot do. In any event, Lafayette offers an explanation as to why her receipt of SSDI benefits and her ADA claim do not genuinely conflict.  The Court finds that Lafayette has failed to produce evidence that a genuine conflict exists, and nonetheless, Gibson has met her burden under *Cleveland* to withstand

23

summary judgment on judicial estoppel.[23]

In *Cleveland*, the Supreme Court explained that on summary judgment, an "ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work.  To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions of her previous job, at least with 'reasonable accommodation.'" 526 U.S. at 798.  As to the adequacy of the explanation, the Supreme Court found that the ADA plaintiff's "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807.  In *Detz,* the Third Circuit found the Court of Appeals for the Seventh Circuit aptly summarized the *Cleveland* analysis:

> Explanations of the sort *Cleveland* requires are, in short, contextual – they resolve the seeming discrepancy between a claim of disability and a later claim of entitlement to work not by contradicting what the plaintiff told the Social Security Administration, but by demonstrating that those representations, under stood in light of the unique focus and requirements of the SSA, leave room for the possibility that the plaintiff is able to meet the essential demands of the job to which he claims a right under the ADA.

*Detz,* 346 F.3d at 118 (quoting *Lee v. City of Salem, Ind.,* 259 F.3d 667, 674-75 (7th Cir. 2001)).

In light of this authority, the Court must initially determine whether the positions taken by Gibson in her SSDI application and her ADA claim genuinely conflict.  The only evidentiary

---

[23]In support of her argument that she is not judicially estopped from asserting her ADA claim, Gibson applies the traditional judicial estoppel approach utilized by the Third Circuit in *Montrose Med. Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779 (3d Cir. 2001).  However, as explained by the Court of Appeals in *Detz,* the situation here more closely resembles *Cleveland* and *Motley v. N.J. State Police,* 196 F.3d 160, 164-66 (3d Cir. 1999).  *Detz,* 346 F.3d at 117-18 & n. 2.  Therefore, the Court will apply the judicial estoppel test used in *Cleveland.*

support proffered by Lafayette is the Disability Determination and Transmittal, dated December 3, 2004 ("SSA Disability Determination"), from the Social Security Administration ("SSA").  (Ex. B to Def.'s Reply Br.)  According to the SSA Disability Determination, Gibson's disability began on July 2, 2004, not on November 5, 2004 as contended by Lafayette.   The SSA Disability Determination does not contain any statements or representations by Gibson as to her limitations or inability to work. Lafayette fails to point to any statements, sworn or unsworn, made by Gibson either in her application for SSDI benefits or elsewhere, let alone statements which genuinely conflict with her ADA claim, despite having apparently received a copy of her SSDI application. Lafayette attempts to rely merely on the fact that SSDI benefits were applied for and received by Gibson to satisfy its burden.  However, the Supreme Court in *Cleveland* specifically rejected this approach.

Thus, this case is factually distinguishable from *Detz* and other Third Circuit cases applying *Cleveland.*   In those cases*,* the court record contained sworn statements from the employees' applications for disability benefits, which were reviewed to determine whether a genuine conflict existed between the positions taken in the disability applications and the ADA claims, or in the case of *Detz,* his ADEA claim.  *Detz,* 346 F.3d at 118-20; *see also Turner v. Hershey Chocolate USA,* 440 F.3d 604, 608 (3d Cir. 2006) (holding plaintiff was not judicially estopped from asserting she was a qualified individual with a disability under the ADA where statements in SSDI application did not state categorically that she could not work at all or take into account employee's entitlement to reasonable accommodation); *Motley v. N.J. State Police,* 196 F.3d 160, 166-67 (3d Cir. 1999) (finding plaintiff failed to proffer a reasonable explanation for his inconsistent statements in application for accidental disability pension with his ADA claim).  Unlike in those cases, Lafayette

has not produced any such statements, sworn or otherwise, despite having a copy of Gibson's SSDI file. Therefore, Lafayette has not presented any statements for the Court to review for genuine conflict.

Notwithstanding the lack of evidentiary support from Lafayette, Gibson proffers an explanation for the apparent inconsistency between applying for and receiving SSDI benefits and the elements of her ADA claim. She explains that her attempt to return to work while receiving SSDI benefits is both consistent with the law and adequately explained by the improvement in her condition as evidenced by Dr. Krafty's release to return to work, albeit with restrictions and after a period of recovery. She asserts that her part-time employment with the Department of Public Welfare since December 2004 further supports that her condition has improved and that she has not taken inconsistent positions.

The Court finds that under the circumstances of this case, in particular, that the requested accommodation was an extended leave of absence, Gibson's explanation is sufficient under the standard enunciated in *Cleveland* to withstand summary judgment. Gibson's request for an extended leave of absence as a reasonable accommodation is consistent with her position with SSA that she could not return to work in August 2004. She further explains that there was a change in her condition since she applied for SSDI, such that she could return to work with accommodation in November 2004. Moreover, as in *Cleveland*, Gibson identified several differences between the analysis conducted under the SSA and the ADA, as recognized in *Cleveland,* such as: (1) the different standards of a legally disabling condition because the SSA does not solicit any information about whether any kind of work can be performed with accommodation; (2) SSDI benefits may be awarded solely on whether an applicant's impairment(s) meet or medically equal a listed

26

impairment;[24] (3) the nature of an individual's disability may change over time, so that the statement made in the application may not reflect the individual's capacities at the time of the relevant employment decision; and (4) it is not inconsistent for an individual who is receiving SSDI benefits to simultaneously seek training and placement through the Commonwealth's OVR program and attempt to return to work, as the SSA encourages this and permits a nine-month trial work period during which SSDI recipients may receive full SSDI benefits.  Thus, in the specific factual context of this case, the Court finds that Gibson has sufficiently explained the different positions taken in her SSDI application and her ADA claim here.  Accordingly, the Court finds that Gibson's ADA claim is not judicially estopped.

Because Gibson's ADA claim is not judicially estopped by her application for and receipt of SSDI benefits, and given that material issues of fact remain as to whether she is a qualified individual under the ADA, whether the requested accommodation was reasonable and not an undue hardship, and whether Lafayette failed to engage in the interactive process in bad faith, the Court recommends that Lafayette's motion for summary judgment as to Gibson's ADA claim be denied.

**2.    Gibson's Interference and Retaliation Claims under FLMA**

Under FMLA, an eligible employee is granted the right to 12 workweeks of leave over any 12-month period, in order to care for a spouse, child or parent who has a serious health condition, or because a serious health condition makes the employee unable to perform the functions of his or her position, among other things.  *Sommer v. The Vanguard Group,* 461 F.3d 397, 399 (3d Cir.

---

[24]The SSA applies a five step sequential evaluation process to determine whether a person is disabled under the Social Security Act.  *See* 20 C.F.R. §§404.1501-1529  At step 3, if the SSA determines that a claimant's impairments meet or medically equal a listing, disability is established, and there is no further inquiry as to whether the claimant can perform her past relevant work (Step 4) or whether jobs exist in the national economy which the claimant can perform given her impairments (Step 5).  There is no indication here at what step Gibson was found to be disabled by the SSA.

2006) (citing 29 U.S.C. § 2612(a)(1)).  "After a period of qualified leave, an employee is entitled to reinstatement to his former position or an equivalent one with 'equivalent employment benefits, pay and other terms and conditions of employment.'"  *Id.* (quoting 29 U.S.C. § 2614(a)(1)).

In this case, Gibson asserts two claims under the FMLA.  First, she contends that Lafayette interfered with her right to benefits under the FMLA in two respects: (1) Lafayette attempted to deny her eligibility for benefits by requiring a marital certificate despite prior approval of FMLA for her common law husband; and (2) Lafayette required her to obtain a doctor's slip for each day she took intermittent leave under FMLA, in violation of 29 C.F.R. § 825.308.  With regard to her retaliation claim, Gibson asserts that she was terminated and denied the chance to return to work in retaliation for exercising her rights under the FMLA.  For the reasons set forth below, the Court concludes that summary judgment should be granted as to Gibson's retaliation claim, but denied as to her claim of interference with her rights under the FMLA.

### a.  Interference Claim

Under 29 U.S.C. § 2615(a)(1), the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. *See also, Sommer,* 461 F.3d at 399 (citing same).  A claim for violation of this provision is typically referred to as an "interference claim." *Sommer*, 461 F.3d at 399 (citation omitted).  The Court of Appeals has held that to establish an interference claim, an employee must show: (1) "that he was entitled to benefits under the FMLA and [2] that he was denied." *Id.* (citing *Callison v. City of Philadelphia,* 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §§ 2612(a), 2614(a)).  The Court of Appeals further opined:

> Under this theory, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions

28

by establishing a legitimate business purpose for its decision. [*Callison*, 430 F.3d] at 119-120.  An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.  *Id.* at 120. Because the FMLA is not about discrimination, a *McDonnell-Douglas* burden-shifting analysis is not required.  *See Parker v. Hanhemann Univ. Hosp.,* 234 F.Supp.2d 478, 485 (D.N.J. 2002) (citing *Hodgens v. Gen'l Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)).

461 F.3d at 399.  The Department of Labor, which has promulgated regulations to implement the FMLA, has stated that unlawful FMLA interference "includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Id.* (quoting 29 C.F.R. § 825.220(b)) (footnote omitted); *see also Sabbrese v. Lowe's Home Centers, Inc.,* 320 F.Supp.2d 311, 327 (W.D.Pa. 2004) (citing same).[25]

Several courts in this Circuit have opined that an employee may bring an interference claim for actions that could "chill" the desire to take FMLA leave, even though the leave is subsequently granted.  *See, e.g., Williams v. Shenango, Inc.,* 986 F.Supp. 309, 320-21 (W.D.Pa. 1997) ("where employer denied request for FMLA leave and suggested that employee take leave on a different week, but retroactively approved the leave after it was taken, reasonable person could conclude that employer interfered with FMLA rights"); *Shtab v. Greate Bay Hotel and Casino, Inc.,* 173 F.Supp.2d 255, 267-68 (D.N.J. 2001) ("where authorization for FMLA leave was denied after leave occurred, noting that a jury could conclude that employer's suggestion that employee take different

---

[25]In *Sabbrese,* the employer did not deny a request for leave or suggest that he wait to take leave.  Rather, the employer disciplined the employee for taking permitted leave (a required break to eat in order to control his blood sugar/diabetes), which Judge Conti found was "arguably a more eggregious 'chilling' of his rights under the FMLA because he was actually penalized for exercising his right to take intermittent leave when medically necessary." 320 F.Supp.2d at 330.  Thus, Judge Conti concluded that reasonable persons could conclude that the discipline imposed "chilled" or otherwise discouraged the employee from asserting his FMLA rights, and therefore, a material issue of fact existed as to whether the employee was actually discouraged from asserting his rights.  *Id.*

date of leave chilled plaintiff's assertion of rights under FMLA").  *But compare Alifano v. Merck & Co., Inc.*, 175 F.Supp.2d 792 (E.D.Pa. 2001) (holding "plaintiff could not bring claim for interference in the absence of any adverse employment action where employer allegedly discouraged but did not deny leave").  The decisions in *Williams* and *Shtab* appear to be in accord with the Court of Appeals holdings in *Callison* and *Sommer,* while *Alifano* does not.  As noted by the *Sommers* court, the absence of discipline, *i.e.,* an adverse employment action, does not defeat a claim for interference with rights under FMLA.  461 F.3d at 399 (citing *Callison,* 430 F.3d at 119-120); *see also Williams,* 986 F.Supp. at 320 n.9.  Therefore, *Alifano* does not appear to state the current law of this Circuit.[26]

In addition, the Court of Appeals decision in *Sherrod v. Philadelphia Gas Works,* 57 Fed. Appx. 68, 73 n.6, 2003 WL 230709, *3 n. 6 (3d Cir. Jan. 29, 2003), although not precedential, is particularly instructive here.  In that case, the employee requested FMLA leave to care for a grandparent.  At the time she submitted her leave request, the employee did not provide any explanation regarding her relationship with her grandparent to allow the employer to determine her eligibility for FMLA leave, as required under FMLA.  The employer initially denied the employee's request for FMLA leave, but subsequently approved the leave after the employee explained that her grandparent had raised her, thereby meeting the "loco parentis" definition of parent under 29 U.S.C. § 2611(7).  Based on 29 C.F.R. § 825.208(a)(1),[27] the court of appeals found that the initial denial of leave was not improper because the employee failed to provide an adequate explanation to show

---

[26]With all due respect to the district court in *Alifano,* the Court of Appeals decisions in *Callison* and *Sommer* were not issued until 2005 and 2006, respectively.

[27]Under 29 C.F.R. § 825.208(a)(1), "[a]n employee giving notice of the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act."

she met the eligibility requirements for leave.  The Court of Appeals further found the initial denial

of leave was not so discouraging that it interfered with the employee's FMLA rights.  *Sherrod,* 57

Fed. Appx. at 72, 2003 WL 230709 at *3 (quoting 29 C.F.R. § 825.208.(a)(1)).

In the present case, Lafayette argues that Gibson cannot establish an interference claim

because it continually permitted her to use her FMLA time through 1999 to 2004, up to the point

of exhaustion in 2004.  (Def.'s Br. at 20.)  In addition, Lafayette submits that FMLA does not

provide leave to care for an unmarried, co-habitant and therefore,  it had no obligation to allow

spousal leave prior to March 27, 2003, because Gibson and her husband were not married and

common law marriage has been abolished in Pennsylvania.  (Def.'s Br. at 20; Def.'s Reply Br. at

4.)  Lafayette further argues that the FMLA provides express authorization for  requesting and

receiving medical certifications or excuses to verify Gibson's absences, citing 29 U.S.C.A. § 2613.

(Def.'s Br. at 21.)

Lafayette's argument overlooks a critical element of an actionable interference claim, that

is, discouraging an employee from using FMLA leave.  As noted above, the Third Circuit in *Sommer*

and *Callison* held that an employee can prove the second element of an interference claim, denial

of benefits, by showing that the employer discouraged her from using FMLA leave, such that her

desire to use such leave was "chilled." In this case, Gibson testified that on several occasions prior

to her official marriage, she was told she could not use FMLA leave to care for her common law

husband because they were not officially married,[28] even though FMLA leave had been approved

for such use in the past and was subsequently approved.  Prior to Gibson's official marriage on

---

[28]Lafayette does not claim that it was not aware of Gibson's common law marriage when she requested
FMLA leave to care for her common law husband.  Therefore, the initial denia here was improper, unlike in *Sherrod,
supra.*

March 27, 2003, common law marriage in Pennsylvania was still recognized,[29] and the regulations specifically include in the definition of "spouse" common-law spouses in states that recognize common-law marriage.  29 C.F.R. §825.113(a).  Therefore, any reliance by Lafayette on the abolition of common law marriage in Pennsylvania was unjustified.[30]

In addition, Gibson contends she was required to obtain a doctor's excuse/slip every time she took intermittent leave, which violates 29 C.F.R. § 825.308, and that this amounts to discouragement from using her FMLA leave.  Under the FMLA, an employer may require that a request for leave, either to care for a spouse or because of a serious health issue that prevents the employee from working, be supported by a certification from a health care provider.  29 U.S.C. § 2613(a).  Section 2613 also defines what constitutes a sufficient certification. 29 U.S.C. § 2613(b).[31] After the initial certification, an employee may require subsequent recertifications subject to the restrictions set forth in 29 C.F.R. § 825.308.  In the case of FMLA leave taken intermittently, the regulations provide that an employer may not request recertification more frequently than the minimum period specified on the initial certification as necessary for such leave, including treatment, and if no period is stated, no more frequently than every 30 days.  29 C.F.R. § 825.308(b)(2) and (c).  However, employers are not so limited where the "employee requests an

---

[29]In 2004, the Pennsylvania legislature amended the Marriage Law to abolish common law marriages contracted after January 1, 2005. *See* 23 Pa.C.S.A. § 1103 (West Supp. 2005).  Common law marriages contracted on or before January 1, 2005 and otherwise lawful remain valid. *Id.*; *see also Costello v. W.C.A.B. (Kinsley Constr. Co.)*, ___ A.2d ___, 2006 WL 4043525, *5 (Feb. 13, 2007).

[30]The present case is distinguishable from *Sherrod* in this respect because in that case, the Court of Appeals found the employer's initial denial was justified.

[31]In the case of certification for intermittent leave to care for a spouse, FMLA provides that sufficient certification consists of a statement that intermittent leave is necessary to care for a spouse who has a serious health condition, or will assist in their recovery, and the expected duration and schedule of the intermittent leave.  29 U.S.C. § 2613(b)(7).  In the case of certification for intermittent leave because of a serious health condition that makes the employee unable to perform the functions of her job, FMLA provides that sufficient certification consists of a statement of the medical necessity for and expected duration of the intermittent leave.  29 U.S.C. § 2613(b)(6).

extension of leave; . . . [c]ircumstances described in the previous certification have changed significantly (e.g., the duration . . . [and] the nature of the illness, the complications); or . . . [t]he employer receives information that casts doubt upon the continuing validity of the certification." 29 C.F.R. § 825.308(b)(2) and (c).  The regulations further provide that  "[a]n employer is not entitled to certification of fitness to return to duty when the employee takes intermittent leave as described in § 825.203."  *See* 29 C.F.R. § 815.310(g).

The record shows that Ms. Bowser testified that it was Lafayette's practice to require all employees taking intermittent leave under FMLA to obtain a doctor's slip every time intermittent leave was taken.  (Bowser Dep. at 12.)  However, the record does not indicate the purpose of or the information that must be included on the doctor's slip.  Preliminarily, the Court notes that where an employer's internal policies conflict with the FMLA, the FMLA governs.  *Callison,* 430 F.3d at 121 (citing 29 U.S.C. § 2652(b)) (other citations omitted).  Thus, in order to invoke the protections of the FMLA, the employee must only comply with the requirements of FMLA where there is a conflicting employment policy.  *Id.*  The Court must therefore determine whether Lafayette's policy regarding doctors' excuses for intermittent leave conflicts with the FMLA.  Unfortunately, the record does not provide sufficient information for the Court to determine whether  the doctors' excuses/slips required for intermittent leave are the equivalent of the certifications/recertifications regulated under the FMLA.[32]  Thus, a material question of fact exists as to this point.

Thus, the Court finds that based on *Williams* and *Sabbrese*, Gibson has alleged sufficient

---

[32]In the event the doctors' excuses are determined to be a form of certification or recertification, the Court notes that the record does not contain any evidence to show that any of the exceptions under 29 C.F.R. § 825.308(c) apply with regard to Gibson that would allow for more frequent recertifications.  To the extent the doctors' excuses required by Lafayette's policy for intermittent leave more closely resemble a certification for fitness to return to duty, they are likewise prohibited under 29 C.F.R. § 825.310(g).

facts to establish a *prima facie* claim of interference with her rights under FMLA, because reasonable persons could conclude that Lafayette's conduct in requiring a marriage certificate discouraged her from using FMLA leave.  In addition, a material issue of fact exists as to whether the doctor's excuses required by Lafayette for intermittent leave constitute certifications/recertifications and/or fitness for duty certifications.  A question of fact remains as to whether Gibson was actually discouraged in exercising her FMLA rights.  Accordingly, the Court recommends that Lafayette's motion for summary judgment as to Gibson's interference claim be denied.

### b.      Retaliation Claim

Under FMLA, Congress also grants employees a cause of action against employers who discriminate against them based on the exercise of their FMLA rights; these claims are referred to as "retaliation claims."  *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 U.S.C. §§ 2615(a)(2)[33] & 2617); *Grosso v. Fed. Express Corp.,* ___ F.Supp.2d ___, 2006 WL 3759714, *5 (E.D.Pa. Dec. 19, 2006) (citing same).  Section 825.220(c) of the regulations implementing the FMLA further provides:

> An employer is prohibited from discriminating against employees . . . who have used FMLA leave.  For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave.  By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c).  Retaliation claims are analyzed under the familiar burden-shifting

---

[33]Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).

framework of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973).  To establish a *prima facie* case of retaliation under FMLA, a plaintiff must show that: "(1) [s]he took an FMLA leave; (2) [s]he suffered an adverse employment decision; and (3) the adverse decision was causally related to [her] leave." *Conoshenti,* 364 F.3d at 135.  Once plaintiff has established her *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  *McDonnell Douglas,* 411 U.S. at 802; *see also Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-07 (1993).  If the employer meets its burden, then the burden shifts back to plaintiff to show that the employer's reasons are pretextual.  *Burdine,* 450 U.S. at 255-56.

With regard to Gibson's *prima facie* case of retaliation, the first element of the three-part test is not disputed–Gibson took FMLA leave.  However, Lafayette submits that Gibson has failed to meet her burden with respect to the second and third elements of her retaliation claim.

The Supreme Court recently clarified the showing necessary to satisfy the adverse employment action requirement  in Title VII retaliation cases in *Burlington N. & Santa Fe Ry. v. White,* 126 S.Ct. 2405, 165 L.Ed. 2d 345 (2006).  The Supreme Court in *Burlington* explained:

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces any injury or harm . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means is well might have 'dissuaded a reasonable worker from [engaging in protected activity].'"

126 S.Ct. at 2414-15 (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Although the Third Circuit has not yet had an opportunity to consider whether the new standard announced in *Burlington Northern* applies to FMLA retaliation claims, several other courts have considered this issue and applied *Burlington Northern* to retaliation claims under FMLA.  *Grosso,*

2006 WL 3759714 at *6 (citing *Metzler v. Federal Home Loan Bank of Topeka,* 464 F.3d 1164, 1171 n. 2 (10th Cir. 2006); *Foraker v. Apollo Group, Inc.,* 2006 WL 3390306, *2 (D. Ariz. Nov. 22, 2006); *Campbell v. Washington County Public Library,* 2006 WL 2612985, *6 (S.D.Ohio Sept. 8, 2006)).  This Court agrees that the standard enunciated in *Burlington Northern* should guide its determination here as to whether Gibson was the subject of an adverse employment action.

Turning now to this case, Lafayette argues that Gibson cannot show she has suffered an adverse employment action because it is undisputed that Gibson was unable to return to work at the expiration of her FMLA leave and at the time of her termination.  In support of this argument, Lafayette submits that in order for Gibson to show that her termination was adverse, she must be able to perform the essential functions of her job at the time of her termination, citing *Dogmantis,* 413 F.Supp.2d at 463.  (Def.'s Br. at 17.)  The Court agrees with Lafayette.  Several district courts in this Circuit that have considered this issue have all concluded that an employee, who is terminated after the expiration of FMLA leave because the employee is unable to perform the essential functions of the job at the time of termination,  has failed to establish the requirement of an adverse employment action for a FMLA retaliation claim.  *See, Dogmantis,* 413 F.Supp.2d at 463 (employee was unable to return to work at time of termination and could not obtain a work release from her doctor until over a month after her termination, thereby failing to establish that she suffered an adverse employment action); *Alifano v. Merck Co.,* 175 F.Supp.2d 792, 795 (E.D.Pa. 2001)(citing *Clark v. Germantown Hosp. & Med. Ctr.,* No. Civ. A.. 00-3862, 2001 WL 122221 (E.D. Pa. Feb. 13, 2001); *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151 (1st Cir. 1998); 29 C.F.R. § 825.214(b)[34])

---

[34]Section 825.214(b) provides that if the "employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA."  29 C.F.R. § 825.214(b).

("Because Plaintiff was not qualified for her job at the time of her termination, she has not shown that she suffered an adverse employment action."); *Smith v. UBS Fin. Serv., Inc.,* No. Civ. 06-03048, 2006 WL 2668203, *3 (D.N.J. Sept. 12, 2006) (citing *Dogmantis* and *Alifano, supra*) (employee who was unable to return to work until nearly two months after his FMLA leave expired failed to show that he suffered an adverse employment action and therefore failed to state a FMLA retaliation claim).          In response, Gibson argues that even though she concedes she was unable to return to work at the expiration of her FMLA leave, that factor is not dispositive of whether she suffered an adverse employment action.   Rather, Gibson contends that in the context of a request for an accommodation in the form of extended leave, Gibson would have remained an employee but for the denial of the leave.   Gibson's argument completely misses the mark.   It is clear that the FMLA, unlike the ADA, does not require an employer to reasonably accommodate an employee's serious health condition.   *Alifano,* 175 F.Supp.2d at 795 (citing 29 C.F.R. §§ 825.702(a) and 825.214(b)). Therefore, she cannot side-step the requirement of an adverse employment action simply by arguing that she could have returned to work with reasonable accommodation in the form of an extended leave.   Because it is undisputed that Gibson was unable to return to work at the expiration of her FMLA leave, and in fact, could not return to work in any capacity for some time thereafter, she did not suffer an adverse employment action. Stated another way, Gibson has failed to show that her termination was materially adverse, such that it might well have dissuaded a reasonable employee from exercising her rights under the FMLA.   Accordingly, the Court finds that Gibson has failed to satisfy her burden of proving a *prima facie* case of retaliation under the FMLA, Therefore, the Court recommends that Lafayette's motion for summary judgment be granted as to the FMLA retaliation

claim.[35]

### 3.      Gibson's Claim for Economic Damages

Lafayette argues that it is entitled to summary judgment on Gibson's claim for economic damages under the ADA[36] and/or FMLA[37] because she has failed to offer any evidence that she sustained an economic loss.  Although she is claiming lost wages, Lafayette submits she does not know the amount of those lost wages.  Lafayette contends that her damages are therefore speculative and such damages are not recoverable.  (Def.'s Br. at 21-22.)  Lafayette further argues that Gibson's claims for back and/or front pay should be dismissed because at the time of her termination, she was unable to work in any capacity, has never presented a return to work slip or new employment application, and she has been deemed disabled by the Social Security administration since 2004. (Def.'s Br. at 22.)  In addition, Lafayette contends that Gibson is not entitled to back pay for periods of time that she otherwise would not have been working even if the alleged discrimination had not occurred.[38]  Finally, Lafayette submits that Gibson's claim for front pay should be dismissed even

[35]Because the Court has concluded that Gibson failed to show an adverse employment action, it need not reach the question of whether the adverse employment action was causally related to her  FMLA leave.

[36]The remedies available under the ADA are the same as those provided in Title VII.  *See* 42 U.S.C. § 12117.

[37]The remedies available under the FMLA are set forth in 29 U.S.C. § 2617.  However, the standard for "willfulness" in the liquidated damages provision under the FMLA is the same as that applied to the liquidated damages provision in the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), *i.e.,* whether the employer "knew or showed reckless disregard" for the employee's statutory rights.  *See Hoffman v. Prof'l Med Team,* 394 F.3d 414, 417 (6th Cir. 2005); *see also* THIRD CIRCUIT MODEL CIVIL JURY INSTRUCTIONS, § 10.4.2 at 41-42 (Dec. 2006).

[38]Lafayette cites *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1101 (3d Cir. 1995), for the proposition that generally, "'[an employment discrimination plaintiff] will not be allowed back pay during any periods of disability' and 'an employer who has discriminated need not reimburse the plaintiff for salary loss attributable to the plaintiff and unrelated to the employment discrimination.'" *Id.* (quoting *Mason v. Ass'n for Indep. Growth,* 817 F.Supp. 550, 554 (E.D.Pa. 1993)).  *Starceski* involved a claim under the ADEA, and the remedies thereunder derive from the Fair Labor Standards Act, not Title VII.  *Rogers v. Exxon Research & Eng'g Co.,* 550 F.2d 834, 842 & n. 13 (3d Cir. 1977); *see also Lorillard v. Pons,* 434 U.S. 575, 584 (1978).  Nonetheless, authority

if the Court were to find that her termination was discriminatory because the salary loss, if any here, is attributable solely to her inability to work.

In response, Gibson argues that she has been capable of working since November 2004, and in support of this statement, proffers her employment as a personal aide through the Pennsylvania Department of Public Welfare since December 2004 to the present, and Dr. Krafty's August 28, 2006 letter, which according to Gibson, states that she is capable of sedentary work since November of 2004.  (Pl.'s Br. in Opp'n at 12.)   In addition, Gibson submits that Lafayette's argument erroneously rests on the fact that Gibson was unable to work at the time of her termination, but because she requested an extension of her leave as an accommodation, the central issue is whether she could have returned to work with additional leave. (*Id.* at 13.)  However, Gibson concedes that she cannot claim back wages for any period of time that she was hospitalized or otherwise incapable of working.  (*Id.*)  Gibson clarifies that she is seeking lost wages from November of 2004 through the present with an appropriate charge for mitigation of damages, and that these issues should be decided by a jury.  (*Id.*)

In its reply brief, Lafayette correctly points out that Dr. Krafty's August 28, 2006 letter does not expressly state that Gibson was able to return to work in November 2004.  Lafayette further contends that the medical records[39] and social security disability records for 2004 show that she was disabled and do not mention her return to work.  Moreover,  given Dr. Mehta's letter of September 2, 2004 indicating she was unable to work, and that Dr. Krafty did not  release her to return to work

---

does exist supporting reliance on the standard used under the ADEA for similar provision under the FMLA.  *See* note 37, *supra*.

[39]The medical records referred to consist of Dr. Krafty's office notes on 9/29/04 and 2/3/05; and Dr. Sunyecz's office notes from 10/1/04 to 10/12/04. (Def.'s Ex. F to its Reply Br.)  These records were submitted to the Court *in camera* due to privacy concerns.

until August 28, 2006, Lafayette argues she is precluded from an award of back pay and front pay.

The parties agree that Gibson cannot claim back wages for any period of time that she was hospitalized or otherwise incapable of working. Nonetheless, the parties disagree as to when Gibson was able to return to work and whether her request for extended leave was a reasonable accommodation. The Court does not construe Dr. Krafty's letter to state that Gibson could not return to work prior to August 28, 2006, as Lafayette suggests. Dr. Krafty does indicate that "[Gibson] was not able to work 6-8 weeks post operatively due to recovery [from] abdominal surgery and post operative infection." (Ex. 1 to Pl.'s Resp. to Def.'s Stmt. of Facts.) Moreover, the medical records of Dr. Sunyecz indicate on October 7, 2004, he received a telephone call from Gibson requesting medical records be sent to her PCP for completion of a disability form; on October 12, 2004, the note indicates Gibson's incision from the surgery was healing well; the progress notes were otherwise unremarkable. Dr. Krafty's medical records were, for the most part, undecipherable; however the progress note on September 29, 2004 appears to indicate an infection near her incision from surgery. This notation appears early on in the 6 to 8 week recovery period. Contrary to Lafayette's assertion, the fact that the progress notes do not indicate a return to work date is of no relevance because the entries[40] are 3 to 6 weeks prior to when Gibson claims she was able to return to work. In any event, a question of fact remains for the jury on this issue, as reasonable persons could find that based on Dr. Krafty's letter, Gibson could have returned to work 6 to 8 weeks after her surgery in September of 2004. Therefore, it is premature at this time to rule as a matter of law that Gibson is not entitled to any back pay because factual issues remain to be determined by the jury.

---

[40]The noted exception is Dr. Krafty's February 5, 2005 progress note. While this note indicates Gibson was being treated for severe abdominal pain, there is no indication as to her work status on that date.

As to Lafayette's claim that Gibson's economic losses are speculative, the Court finds no merit to this argument.  Gibson has articulated her theory of damages–she is seeking lost wages from November 2004 to the present, with an appropriate mitigation of damages.  Although not brimming with detail, Gibson's claim for economic damages sufficiently apprises Lafayette of the basis of her claim, *i.e.,* lost wages, and as her employer, Lafayette is aware of her rate of pay, and therefore can easily calculate the economic damages prior to offsets[41] and  mitigation.  Nonetheless, the exact extent of the economic damages cannot be ascertained until the jury resolves the outstanding the factual issues  noted above.

Moreover, front pay is awarded by the Court and only if it finds that reinstatement is not possible.  *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, 789 F.2d 253, 261 (3d Cir. 1986).[42]  At this juncture, the facts are not sufficiently developed to determine whether or not Gibson is entitled to front pay.  Therefore, summary judgment on the issue of front pay is inappropriate at this time.

Accordingly, the Court recommends that Lafayette's motion for summary judgment with regard to Gibson's claim for economic damages under the ADA and/or FMLA be denied.

### 4.    Gibson's Claim for Punitive and Liquidated Damages

Finally, Lafayette requests summary judgment as to Gibson's claim for punitive and liquidated damages under the ADA and the FMLA.  In support, Lafayette relies on 42 U.S.C. §1981a(b)(1), which provides that   punitive damages may be awarded only if the plaintiff "demonstrates that the [employer] engaged in a discriminatory practice or . . . practices with malice

---

[41]The Court notes that the Third Circuit has held that collateral benefits, such as unemployment compensation and social security benefits, generally are not deducted from a back pay awards in Title VII cases.  *See Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, (3d Cir. 1983) (citing *Smith v. United States,* 587 F.2d 1013, 1015 (3d Cir. 1978) (social security)) (other citations omitted).

[42]The FMLA does not provide  recovery for front pay.  29 U.S.C. § 2617.

or with reckless indifference to the federally protected rights of an aggrieved individual." Lafayette also relies on case law in the Third Circuit holding that liquidated damages "are punitive in nature and designed to deter willful conduct." *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1102 (3d Cir. 1995) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111 (1985)). According to Lafayette, because the record contains no evidence that its conduct was at any time willful, malicious, reckless, or in bad faith, it is entitled to summary judgment on Gibson's claims for punitive and liquidated damages.

In response, Gibson argues that a jury could find that Lafayette's failure to engage in the interactive process in any manner supports a reckless indifference to her federally protected rights. Gibson further argues that at this juncture, the evidence shows that Lafayette did not have a reasonable basis to deny FMLA leave to care for her common law spouse, to require medical certifications/recertifications for each use of intermittent leave, and to terminate her employment despite a request for an extended leave of absence which she maintains was reasonable. As these issues present material factual questions for the jury, Gibson urges the Court to deny Lafayette's motion for summary judgment on her claim for punitive and liquidated damages.

The FMLA provides that monetary damages,[43] including interest and liquidated damages, as well as equitable relief, may be recovered in the event of a violation of Section 2615. *See* 29 U.S.C. § 2617. With regard to liquidated damages, such damages will be awarded unless the employer "proves to the satisfaction of the court that the act or omission which violated section 2615 . . . was in good faith and that the employer had reasonable ground for believing that the act or

---

[43]Under Section 2617, monetary damages consist of lost wages, employment benefits, or other compensation denied or lost as a result of a violation under FMLA; however, if none of these items have been lost or denied, then the employee may recover any actual monetary losses incurred as a direct result of the violation, such as the cost of providing care, limited to the equivalent of 12 weeks of wages. 29 U.S.C. § 2617(a)(1)(A)(i).

omission was not a violation of section 2615 . . .." 29 U.S.C. 2617(a)(1)(A)(iii).  However, punitive

damages cannot be recovered under the FMLA.  *Zawadowica v. CVS Corp.*, 99 F.Supp.2d 518, 540

(D.N.J. 2000) (citations omitted); *Oby v. Baton Rouge Marriott*, 329 F.Supp.2d 772, 788 (M.D.La.

2004) (same).[44]

        Under the ADA or Title VII, there is no provision for liquidated damages; however,

Congress did provide for recovery of punitive damages under the ADA, but only if the violation

concerns the provision of a reasonable accommodation.  42 U.S.C. § 1981a(a)(2) and (b).  Thus, in

order to recover punitive damages under Section 1981a, the employee must show that the employer

"engaged in a discriminatory practice or . . . practices with malice or with reckless indifference to

the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  However,

punitive damages may not be awarded if the employer "demonstrates good faith efforts, in

consultation with the person with the disability who has informed [it] that accommodation is needed,

to identify and make a reasonable accommodation that would provide such individual with an

equally effective opportunity and would not cause an undue hardship on the operation of the

business."  42 U.S.C. § 1981a(a)(3).  In *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 534-35 (1999),

the Supreme Court construed the punitive damages provision in Section 1981a(b) and found that

plaintiffs are not required to show egregious or outrageous discrimination in order to recover

_____

        [44]In addition, the Court notes that nominal damages are not an available remedy under the FMLA. *See
Walker v. UPS,* 240 F.3d 1268, 1278 (10th Cir. 2003) (finding no grounds for relief under FMLA where the
employee admittedly suffered no actual monetary losses as a result of the alleged violation of FMLA and presented
no claim for equitable relief); *Lapham v. Vanguard Cellular Sys., Inc.,* 102 F.Supp.2d 266, 270 (M.D.Pa.
2000)(while plaintiff had a cause of action for interference, she suffered no wage or other monetary loss, therefore
"she cannot obtain relief under the FMLA and her claim must be dismissed."); *Oby,* 329 F.Supp.2d at 788 ("It is
clear that nominal damages are not available under the FMLA because the statutory language of the FMLA
specifically limits recovery to actual monetary losses.") If Gibson is unable to prove some actual monetary loss or
entitlement to some equitable relief as a result of Lafayette's alleged interference with her rights under the FMLA at
trial, she will not be entitled to recovery on this claim.

punitive damages under Title VII, but that proof of intentional discrimination alone will not be sufficient to justify an award of punitive damages.  *Id.* at 534-35.  Thus, the Supreme Court concluded  that to be liable in punitive damages, "[t]he employer must act with 'malice or with reckless indifference *to the [plaintiff's] federally protected rights.*'  The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535.  Moreover, the Third Circuit has opined that in determining whether the employer's conduct meets this standard, the focus is on the employer's state of mind.  *Gagliardo v. Connaught Labs., Inc.,* 311 F.3d 565, 573 (3d Cir. 2002) (citing *Kolstad, supra*).

Although Gibson's amended complaint is not a model of clarity, the Court construes her request for punitive damages to be limited to her ADA claim, based on the allegations set forth in paragraph 29 of the amended complaint and in paragraph (e) in her prayer for relief, and the case law holding punitive damages are not recoverable under the FMLA; the Court reads her request for liquidated damages to be limited to her FMLA claims, based on the allegations set forth in paragraph 30 of her amended complaint and in paragraph (d) of her prayer for relief, and the absence of any provision for such damages under Title VII or the ADA.  That being said, Lafayette's motion for summary judgment on Gibson's claim for punitive damages is viewed as applying to Gibson's ADA claim; the summary judgment motion on liquidated damages is viewed as applying to Gibson's FMLA claims.

With regard to Gibson's ADA claim, the Court has already found that a material issue of fact exists with regard to whether Lafayette engaged in the interactive process in good faith.  The evidence shows that Lafayette did not attempt to obtain any information regarding Gibson's

condition to allow it to consider the reasonableness of the request for accommodation. Additionally, Lafayette does not content that it was not aware of its obligations under the ADA. Therefore, the Court concludes that reasonable persons could find that Lafayette's denial of Gibson's request for extended leave without participating in the interactive process constitutes reckless indifference to federally protected rights.

As to Gibson's interference claim under the FMLA, the Court earlier determined that a material issue of fact exists as to whether Lafayette's conduct discouraged and therefore interfered with the exercise of Gibson's rights under the FMLA. Arguably, reasonable persons could find that Lafayette's unjustified initial denial of leave to care for her spouse and alleged violations of certification/recertification regulations, demonstrates a lack of good faith and that Lafayette did not have a reasonable basis for believing its actions were not a violation of the FMLA. The Court cannot conclude at thus juncture that Gibson is not entitled to liquidated damages on her FMLA interference claim.

Accordingly, because material issues of fact exist with regard to whether Gibson is entitled to punitive damages as to her ADA claim and liquidated damages as to her FMLA interference claim, the Court recommends that Lafayette's motion for summary judgment on these issues be denied.

## III.    **CONCLUSION**

For the reasons set forth above, it is recommended that Defendant's Motion for Summary Judgment be granted in part and denied in part. It is recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's FLMA retaliation claim, but denied in all other

respects.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Dated:  March 5th, 2007                    By the Court:


                                           LISA PUPO LENIHAN
                                           United States Magistrate Judge


cc:     Honorable Joy Flowers Conti
        United States District Judge

        All Counsel of Record
        *Via Electronic Mail*